**MAGNANIMO DEAN LAW, APC**
LAUREN A. DEAN (SBN 174722)
5850 Canoga Avenue, Suite 400
Woodland Hills, CA 91367
Telephone: (818) 305-3450
Facsimile: (818) 305-3451
Email: Lauren@MagDeanLaw.com

**GAINEY McKENNA & EGLESTON**
THOMAS J. MCKENNA
GREGORY M. EGLESTON
501 Fifth Avenue, 19th Floor
NY, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| PETER NOGES AND VICTORIA MORALES, Derivatively on Behalf of Nominal Defendant VAXART, INC., ) ) ) ) | CASE NO.: **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| Plaintiffs, ) ) | **JURY TRIAL DEMANDED** |
| ) ) | |
| ANDREI FLOROIU, TODD DAVIS, MICHAEL J. FINNEY, ROBERT A. YEDID, KEITH MAHER, STEVEN BOYD, AND WOUTER W. LATOUR, ) ) ) ) ) | |
| ) | |
| Defendants, ) ) | |
| -and- ) ) | |
| ) ) | |
| VAXART, INC., ) ) | |
| Nominal Defendant. ) ) | |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

Plaintiffs Peter Noges and Victoria Morales ("Plaintiffs"), on behalf of Vaxart, Inc. ("Vaxart" or the "Company"), derivatively, allege the following based upon personal knowledge as to themselves and their own acts, and upon information and belief and investigation of counsel as to all other matters. That investigation included, among other things, a thorough review and analysis of public documents, court filings, press releases and news articles concerning Vaxart, and the other facts as set forth herein:

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought on behalf of and for the benefit of Vaxart, against certain of its officers and/or directors named as defendants herein seeking to remedy their breaches of fiduciary duties. Defendants' actions have caused, and will continue to cause, substantial financial harm and reputational damage to Vaxart.

2.      Vaxart is a small biotechnology company that is developing vaccines that are taken orally, as opposed to traditional vaccines that are received via injection. In 2019, the Company was developing oral vaccines for norovirus and seasonal influenza. The Company was also investigating using its technology to develop oral vaccines for respiratory syncytial virus and two strains of human papillomavirus. But Vaxart was financially performing poorly. Despite doubling revenue between 2018 and 2019, the Company was running out of money. The Company shut down its norovirus vaccine program, as well as other projects, and fired half of its employees, to try and stem the tide.

3.      During virtually all of 2019, the Company's common stock traded at or well below $1.00 (having traded above $20 per share in 2016). By the end of September 2019, Armistice Capital, LLC, ("Armistice") a New York-based hedge fund, had accumulated a majority of the Company's common stock at prices ranging primarily between $0.30 and $0.40 per share. Armistice quickly used its large stake in Vaxart to put Armistice and its two principals – Defendants Steven J. Boyd ("Boyd") and Keith Maher ("Maher") – in control of Vaxart. For example, in 2019, Armistice used its control to cause Vaxart to (1) expand its board of directors to include Boyd and Maher and (2) issue warrants to Armistice that would allow Armistice to purchase 4 million shares

of Vaxart common stock at $1.10 per share, and an additional 16.7 million shares of Vaxart common stock at only $0.30 per share, which was roughly where Vaxart common shares continued to trade during the 4th quarter of 2019 and early 2020.

4.      Unbeknownst to investors, the Company decided to shut down its norovirus vaccine program, which it had spent much of 2019 outing.  For instance, the Company decided to lay off confidential witness 1 ("CW1")[1] — who had served as the Company's lead norovirus researcher from the spring of 2018 until December 31, 2019.   Vaxart also sought to conceal just how unstable its position was, for instance by falsely assuring the market on January 2, 2020, that the Company was going to increase its efforts to develop a norovirus vaccine (when it had actually just canceled that program).  In short, the Company's troubles went far beyond its now canceled norovirus program; in fact, as CW1 was told by a senior Vaxart officer shortly before being laid off, Vaxart management expected the Company to run out of money and go out of business in just a few months unless it could somehow find new investor financing or a new development partner.

5.      Then an extraordinary opportunity arose that would allow Armistice (and various cooperating Individual Defendants, including several Vaxart officers and directors) to enrich themselves by exploiting a tragic health crisis.  By late January 2020, the first cases of COVID-19 outside of China were reported, and on January 30, 2020, the World Health Organization ("WHO") declared the outbreak a "Public Health Emergency of International Concern."  Before the market opened on January 31, 2020, the Company – despite never having successfully developed a commercial vaccine over its 16 years in business – issued a press release stating that the Company had begun work to "develop a coronavirus vaccine candidate based on its proprietary oral vaccine platform."  In response, the Company's stock price soared that day to close at $1.25 per share, up from the prior day's closing of $0.73 per share — a stunning one day increase of 71%.

6.      As stated below, during the early spring of 2020, Defendants had numerous additional opportunities to observe how easily the Company could cause its stock price to materially

---

[1]      All references to confidential witnesses are found in the Securities Class Action (defined below).  This information is incorporated herein under information and belief.

increase every time the Company issued a statement (including those constituting misleadingly incomplete half-truths) that purported to announce positive developments in connection with it its purportedly robust efforts to research, develop, and manufacture an effective COVID-19 vaccine. As a result of those statements, between the close on March 17 and April 28, 2020, the Company's stock roughly doubled in value, from $1.93 to $3.85.  And Armistice began to take advantage on April 28, 2020, selling approximately 1.3 million shares that day, for proceeds of $4.37 million, at an average price $3.38.

7.     However, press reports in late April that the White House had created a program called "Operation Warp Speed" ("OWS") that would provide huge amounts of government support to fund a small (but as yet unnamed) group of vaccine manufacturers would lead to far more lucrative opportunities for Defendants to manipulate investors in order to reap far greater rewards and the price of Vaxart stock.  For instance, although both the *New York Times* ("*NYT*") and *Bloomberg* reported on April 29, 2020 that the federal government had created OWS and that it would provide billions of dollars in funding to selected private companies to speed development and manufacture of multiple COVID-19 vaccine candidates, the government kept the particulars of OWS secret, and would neither confirm nor deny rumors of who the select few candidates might be.  After two weeks of swirling rumors and resulting swings in the stock prices of numerous pharmaceutical companies that were the subject of those rumors, investor excitement only heightened when the White House officially confirmed OWS's existence on May 15, 2020, and announced that the program had narrowed its evaluation of 100 candidates down to 14. As Defendants knew, investor sentiment toward Vaxart stock – and Vaxart's resulting stock price – could be readily manipulated by misleading a significant portion of the buy-side market for vaccine stocks into believing that Vaxart's vaccine had a realistic shot at making OWS's short list or had otherwise shown sufficient promise to be a serious candidate for expedited development and mass-scale production.  In so doing, they could create at least a short-lived "pop" in their stock price, giving them the opportunity to sell into that "pop."  The only problem was that restriction on

Armistice's warrants made selling all their holdings into such a "pop" extremely difficult, if not impossible.

8.      Still, the Armistice did not hesitate to use their control of the Company to exploit the combination of investor uncertainty and excitement over OWS to profit at the expense of unsuspecting investors.   From April 29 to May 1, 2020, the Armistice unloaded 6.3 million Company shares for another roughly $18 million.   And with the help of a few well-timed Company statements in May that further touted the Company's alleged plans and the narrowing of its focus on its purportedly most promising "vaccine candidate," Armistice unloaded over 10 million additional Company shares between May 4 and June 3, 2020, at average prices between $2.50 and $3.19, for more than $30 million in additional proceeds.   In total, Armistice dumped 18.2 million of its Company shares between April 28 and June 3, 2020.

9.      Although Armistice had succeeded in offloading 72.8% (18.2 million) of the 25 million Company shares it owned outright for an enormous profit, Armistice still owned 7 million shares outright — and even more significantly it still held warrants for 21 million more. But Armistice's warrant positions came with a most troublesome restriction — namely, conditions that (a) limited the amount of warrants that could be exercised at any one time so that, as of their exercise, the holder's total holding of actual Company common shares did not exceed a certain percentage of all such shares outstanding and (b) placed a 60-day moratorium between providing notice to the Company that Armistice sought to increase its beneficial ownership, and the increase taking effect. Since one of the purposes of such exercise restrictions, is to protect current shareholders from dilution without notice and a chance to sell before that dilution, Armistice could not just tell the company to hand it new shares up to the limit, flip them instantly, and then do it again to effectively run around the exercise restrictions.

**JURISDICTION AND VENUE**

10.      Pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of

sections 10(b) and 21D of the Exchange Act.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

11.     The Court has jurisdiction over each defendant because each defendant is either a corporation that does sufficient business in California or is an individual who has sufficient minimum contacts with California so as to render the exercise of jurisdiction by the California courts permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because one or more of the Defendants either resides in or maintains executive offices in this District, including Nominal Defendant Vaxart, a substantial portion of the transactions and wrongs complained of herein – including Defendants' (defined below) primary participation in the wrongful acts detailed herein and aiding and abetting in violations of fiduciary duties owed to Vaxart – occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

13.     In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## **PARTIES**

### **Plaintiffs**

14.     ***Plaintiff Peter Noges*** ("Plaintiff Noges") is a current Vaxart shareholder during the relevant period.  Plaintiff Noges will continue to hold Vaxart shares throughout the pendency of this action.  Plaintiff Noges will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

15.     ***Plaintiff Victoria Morales*** ("Plaintiff Morales") is a current Vaxart shareholder during the relevant period.  Plaintiff Morales will continue to hold Vaxart shares throughout the pendency of this action.  Plaintiff Morales will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

**Nominal Defendant**

16.     Nominal Defendant Vaxart is a corporation with principal executive offices located at 70 Harbor Way, Suite 300, South San Francisco, California 94080.  Vaxart purports to be a clinical-stage biotechnology company primarily focused on the development of oral recombinant vaccines based on its proprietary oral vaccine platform. As of December 31, 2019, Vaxart had only 14 full-time employees, of which only seven were engaged in research and development. The remaining employees were engaged in finance, human resources, administration, and business and general management.

**Director Defendants**

17.     *Defendant Andrei Floroiu* ("Floroiu") has served as a director since April 2020 and as Chief Executive Officer ("CEO") since June 2020.  Prior to being appointed to these positions at Vaxart, Defendant Floroiu had been employed by Armistice Capital, as a Senior Analyst from January to August 2013 Floroiu had also previously worked with Defendant Boyd at McKinsey & Company ("McKinsey"). Defendant Floroiu approved the issuance of the spring-loaded options and the Armistice warrant amendments.  On June 8, 2020, Defendant Floroiu received spring-loaded options to purchase 54,720 shares of Vaxart stock with a $1.71 strike price, $0.68 below the closing price that day. On June 15, 2020, Defendant Floroiu received additional spring-loaded options to purchase 1,745,280 shares of Vaxart stock with a $2.46 strike price. Defendant Floroiu personally benefited from his receipt of the spring-loaded options.

18.     *Defendant Todd C. Davis* ("Davis") has served as a director since 2019.  Defendant Davis authorized and approved Vaxart's manipulated stock options and the amendment to the warrant agreements with Armistice. On June 8, 2020, Defendant Davis received spring-loaded options to purchase 65,700 shares of Vaxart stock with a $2.39 strike price. Defendant Davis personally benefited from his receipt of the spring-loaded options.

19.     *Defendant Michael J. Finney* ("Finney") has served as a director since 2018. Defendant Finney served on the board of directors for pre-public Vaxart from 2007.  Defendant Finney is a member of the Compensation Committee.  Defendant Finney is a member of the Science

and Technology Committee.  Defendant Finney approved the issuance of the spring-loaded options and the Armistice warrant amendments, as described herein.  On June 8, 2020, Defendant Finney received spring-loaded options to purchase 65,700 shares of Vaxart stock with a $2.39 strike price. Defendant Finney personally benefited from his receipt of the spring-loaded options.

20.   **Defendant Robert A. Yedid** ("Yedid") has served as a director since 2019. Defendant Yedid is a member of the Audit Committee. Since 2014, Defendant Yedid has been Managing Director of LifeSci Advisors, LLC, a healthcare-dedicated investor relations/public relations firm.  At approximately the same time that Armistice took control of Vaxart and Defendant Yedid was brought on to Vaxart's Board, his company, LifeSci Advisors, took over the role of public relations and was the contact point on every single press release starting on June 3, 2020 and for the duration of the Relevant Period. LifeSci Advisors was brought in to maximize Armistice's investment in Vaxart.  According to LifeSci's website, the company "works with clients to develop an impactful investor communications program that starts with investment thesis development and corporate positioning.  Our corporate communications team—unique in our Wall Street experience and credibility—works with our clients on developing an effective corporate presentation with an emphasis on highlighting key messages for investors. We draft and revise news releases and earnings call scripts. Moreover, we advise the drafting of other corporate materials including IR websites, fact sheets, FAQ's and shareholder letters."  Defendant Yedid approved the issuance of the spring-loaded options and the Armistice warrant amendments, as described herein.  On June 8, 2020, Defendant Yedid received spring-loaded options to purchase 65,700 shares of Vaxart stock with a $2.39 strike price.  Defendant Yedid personally benefited from his receipt of the spring-loaded options.

21.   **Defendant Keith Maher** ("Maher") served as a director of the Company from October 2019 until January 2021. Since 2019, Defendant Maher has served as Armistice's Managing Director.  Defendant Maher authorized and approved the issuance of the spring-loaded options and the Armistice warrant amendments.

22.     Defendants Floroiu, Davis, Finney, Yedid and Maher are collectively herein referred to as the "Director Defendants".

**Additional Defendants**

23.     **Defendant Steven Boyd** ("Boyd") served as a director of the Company from October 2019 until January 2021.   Defendant Boyd is Armistice's founder, sole owner, Chief Investment Officer ("CIO"), and Managing Partner.  At all material times, Defendant Boyd has also served as a director of the Armistice Master Fund. Armistice Capital is the parent entity of multiple Armistice entities all with the Armistice name, including Armistice Capital Master Fund, Ltd, which held the shares of Vaxart at issue here.  Defendant Boyd authorized and approved the issuance of the spring-loaded options and the Armistice warrant amendments, which he benefited from as sole owner of Armistice.  Throughout the events in question, Defendant Boyd signed all of Armistice's corporate filings on Armistice's behalf.

24.     **Defendant Wouter W. Latour** ("Latour") served as President, CEO, and a director of the Company from February 2018 until June 16, 2021.  Defendant Latour served as Chairman of the Board from December 3, 2019 until June 16, 2021. Defendant Latour served as President, CEO, and a director of Vaxart before the Company went public. Although Defendant Latour was replaced as Vaxart's CEO by Defendant Floroiu on June 14, 2020, Defendant Latour continues to serve as a director and as Chairman of Vaxart's Board.  Defendant Latour approved the issuance of the spring-loaded options and the Armistice warrant amendments, as described herein.  On June 8, 2020, Defendant Latour received spring-loaded options to purchase 900,000 shares of Vaxart stock with a $1.70 strike price, $0.69 below the closing price that day.  Defendant Latour personally benefited from his receipt of the spring-loaded options.

25.     Defendants Boyd and Latour are collectively referred to here in as the "Previous Board Defendants".

26.     The Director Defendants and Previous Board Defendants are collectively referred to herein as the "Defendants."

**Non-Parties**

27.     ***Non-party Julie M. Cherrington*** ("Cherrington") serves as a director.  Non-party Cherrington is a member of the Compensation Committee.  Defendant is a member of the Audit Committee.  Non-Party Cherrington is the Chair of the Science and Technology Committee.

28.     ***Non-party Karen J. Wilson*** ("Wilson") has served as a director since August 2020. Non-party Wilson is the Chair of the Audit Committee.

29.     ***Non-party David Wheadon*** ("Wheadon") has served as a director since April 2021. Non-party Wheadon is the Chait of the Compensation Committee.  Non-party Wheadon is a member of the Science and Technology Committee.

**Non-party Armistice**

30.     Defendant Armistice Capital, LLC, is a New York, New York-based hedge fund focused on health and consumer companies. Founded in April 2012 by Defendant Boyd, it is incorporated in Delaware.  Boyd continues to operate Armistice, serving as its CIO and Managing Partner, along with Defendant Maher, who has served since 2019 as Armistice's Managing Director. Collectively Armistice, Boyd and Maher are occasionally referred to herein as the "Armistice Defendants".

31.     Armistice is the parent and controlling entity of several Armistice-labeled funds, including Armistice Capital Master Fund Ltd., which is incorporated in the Cayman Islands, lists Armistice Capital's headquarters as its mailing address, and lists Boyd as its director and Managing Member.

32.     Armistice began investing in Vaxart in August 2018 and became a controlling shareholder in late 2019.

33.     After becoming Vaxart's controlling stockholder, Armistice promptly took over Vaxart's Board.  Armistice's founder, Defendant Boyd, became and remained a member of Vaxart's Board, as did an Armistice Managing Director, Defendant Maher.  At the same time that Boyd and Maher joined the Board, so did Defendants Yedid and Davis who Boyd and Maher, by virtue of their control of Armistice, had previously worked with when Armistice held over 3 million shares of BioDelivery Sciences International, Inc. ("BDSI"), about 5.86% of that company's equity,

and participated in a $50 million equity financing deal with that company.  At one point, in May 2016, Armistice was BDSI's second-largest beneficial owner, after Broadfin Capital, LLC, who also served as a major Vaxart shareholder. Throughout Armistice's ownership of BDSI, Armistice worked with Davis, a BDSI board member, and Yedid, who served as managing director of BDSI's public relations firm and frequently signed BDSI press releases himself.

34.     As of September 30, 2019, Armistice owned approximately 52% of the voting power of Vaxart's outstanding shares of common stock, making Vaxart a "controlled company" within the meaning of applicable NASDAQ listing rules.  According to the 13D/A Vaxart filed on October 7, 2019, by October 2, 2019, Armistice owned 65.2% of the shares.

35.     In its Form 10- K filed March 19, 2020, the Company recognized Armistice's continuing effective control, publicly stating that:

> Armistice . . . as of March 17, 2020, still beneficially owned more than 35% of the voting power of our outstanding shares.
>
> As a result, Armistice has the ability to substantially influence us and exert significant control through this ownership position. Armistice may significantly influence the elections of directors, issuance of equity, including to our employees under equity incentive plans, amendments of our organizational documents, or approval of any merger, sale of assets or other major corporate transaction. Armistice's interests maY not always align with our corporate interests or the interests of other stockholders . . .

## SUBSTANTIVE ALLEGATIONS

**A.     Armistice Takes Control of the Company**

36.     Founded in March 2004, the Company has yet to successfully develop and commercialize a single product of its own.

37.     In February 2018, the Company became a public company through a reverse merger when it completed its combination with Aviragen Therapeutics, Inc. ("Aviragen"). The newly-combined company then adopted the name "Vaxart" and switched its ticker symbol to "VXRT."

38.     From the beginning, the Company promised to reinvent vaccines by ditching the need for needles and visits to the doctor or pharmacy.  As the Company declared in its January 2,

---

2018 Prospectus mailed to shareholders of Aviragen and Vaxart urging approval of the proposed merger:

> Vaxart's oral vaccines are administered using a convenient room temperature-stable tablet, rather than by injection. Vaxart believes that tablet vaccines are easier to distribute and administer than injectable vaccines and have the potential to significantly increase vaccination rates.

39.     During the fiscal years of 2018 and 2019, the Company lost nearly $39 million (on revenues of $9.7 million in 2019 and $4.2 million in 2018).  The Company acknowledges that "[o]ur ability to generate significant revenue and achieve and maintain profitability will depend on our ability to successfully complete the development of our tablet vaccine candidates . . . and to obtain the necessary regulatory approvals."

40.     Pursuant to a public offering of both common stock and warrants, on April 11, 2019, Vaxart sold Armistice warrants to purchase 4,090,909 shares of Vaxart common stock at $1.10 per share.  Warrants are instruments used to obtain other securities, including common stock, whereby the warrant-holder (in this case, Armistice) can convert individual warrants held into a pre-determined number of shares (in this case, one warrant could be converted into one share of Vaxart common stock that could be purchased for $1.10 per share).  The warrant-holder is then permitted to sell its newly acquired shares, subject to any number of restrictions.

41.     Pursuant to the terms of the Offering, Armistice was limited from entirely exercising its warrants.

42.     On September 30, 2019, Armistice obtained warrants to purchase 16,666,667 shares of Vaxart common stock at $0.30 per share. Again, the Company imposed a beneficial ownership limitation of 4.99% and a 60-day notice requirement on Armistice's ability to increase this percentage, up to 9.99%.

43.     By September 30, 2019, Armistice had also acquired a majority stake in the Company through its holdings in the Company's common stock.   As the Company reported in its 3Q 2019 Form 10-Q, as of September 30, 2019, Armistice held approximately 52% of the Company's outstanding shares of common stock and "[a]s a result, Armistice has the ability to substantially influence us and exert significant control through this ownership position."

44.     On October 8, 2019, Armistice filed an amended Schedule 13D form noting that it controlled 25 million shares of Vaxart common stock, representing 65.2% of all outstanding shares, signed by Defendant Boyd.  Indeed, Armistice expanded the Company's Board to eight seats in October 2019 and appointing Boyd, Armistice's Founder and Managing Member, and Maher, Armistice's Managing Director, to Vaxart's Board along with Defendants Yedid and Davis who replaced two former pre-Armistice directors.

**B.     Armistice Shuts Down the Company's Norovirus Program**

45.     The Company's common stock price continued to struggle throughout the second half of 2019 and by October 2019 fell below $0.40 per share.  During the prior two fiscal years, the Company had lost nearly $39 million.  In multiple filings, the Company acknowledged that "[o]ur ability to generate significant revenue and achieve and maintain profitability will depend on our ability to successfully complete the development of our tablet vaccine candidates . . . and to obtain the necessary regulatory approvals."

46.     On December 26, 2019, the Board under Armistice control voted to terminate between 15 and 20 employees, about half of the Company's personnel – mainly manufacturing – and cut ties with KPMG LLP.

47.     Upon information and belief, CW1 was retained in May 2018 and served as the Company's lead norovirus researcher until December 31, 2019.  CW1 was tasked with overseeing the Company's norovirus clinical trials and reported directly to Defendant Latour, the Company's previous CEO.

48.     Prior to CW1's employment with the Company, Vaxart had retained a contract manufacturing organization, Lonza Pharma & Biotech ("Lonza"), to develop its norovirus vaccine. After the Company retained CW1, it terminated its relationship with Lonza.  In the fall of 2019, the Company retained Lonza again to supplement CW1's work.  Shortly thereafter, Defendant Latour informed CW1 and other Company personnel that Armistice executives sought to cease all operations relating to norovirus vaccine development, as a cost cutting measure.  CW1 challenged this decision, emphasizing that the Company had already executed the manufacturing agreement

with Lonza, and noting that breaching the agreement – for which Lonza had already commenced performance – would be a costly endeavor. In late December 2019, CW1 received a phone call from Defendant Latour, where they discussed the cancellation/breach of the Lonza contract. ***Latour explained that this contract termination effectively meant that the Company could no longer pursue development of the norovirus vaccine. Latour further stated that the Company would be "on life support for the next three months" and that if the Company could not obtain a partnership with a third party in that timeframe "it was over."*** Nonetheless, the Company went ahead, terminated its agreement with Lonza, and discontinued its norovirus vaccine program. At this point in time, the Company only retained a single partnership agreement, with Johnson & Johnson, to develop its influenza vaccine (not norovirus). Shortly thereafter, the Company terminated CW1.

49.     On January 2, 2020, the Company announced that it had laid off its manufacturing division but continued to claim to investors that the Company has "development programs . . . that are designed to protect against coronavirus, ***norovirus***, seasonal influenza and respiratory syncytial virus (RSV)." [Emphasis added]. At this point, the Company did not inform investors that it had discontinued its norovirus program in the fall of 2019, only informing the public in March 2020 that (after it raised an additional $10 million in a direct offering) in light of the Company's effort to develop a COVID-19 vaccine, "we have put several vaccine programs ***on hold***, including the norovirus vaccine program." [Emphasis added].

**C.     COVID-19 Presents Vaccine Manufacturers a New Opportunity**

50.     By the middle of January 2020, the Coronavirus first identified in China approximately one month earlier was detected in multiple countries, including Thailand, Japan, South Korea, and the United States, which confirmed its first case on January 20, 2020. On January 30, 2020, the WHO declared the outbreak a "Public Health Emergency of International Concern".

51.     On January 31, 2020, the Company issued a press release with the headline, "**Vaxart Announces Initiation of Coronavirus Vaccine Program**," stating that it had "initiated a program to develop a coronavirus vaccine candidate based on its proprietary oral vaccine

platform."  The press release failed to mention that its oft-touted "proprietary platform" had *never*

*once* in the Company's history actually led to the creation of a viable, commercializable product.

According to CW1, this was the exact same platform the Company had utilized in its secretly

shuttered norovirus program.

52.    That same day, the Company's stock price to close above $1.00 for the first time

since early April 2019, closing at $1.25, a 71% gain against the prior day's closing price.

53.    On February 27, 2020, the Company announced that it would shortly engage in

another direct offering priced-at-the market, selling to several institutions 4,000,000 shares of

common stock and warrants to purchase up to 2,000,000 shares "at a combined purchase price of

$2.50 per share and associated warrant," which would raise $10 million.  The press release stated

that the Company intended to use the net proceeds to support clinical and preclinical development

of its vaccine candidates.

54.    On March 18, 2020, the Company issued a press release entitled: "**VAXART
ANNOUNCES IT ENTERED INTO AN AGREEMENT WITH EMERGENT
BIOSOLUTIONS FOR THE DEVELOPMENT AND MANUFACTURING OF ORAL
CORONAVIRUS (COVID-19) VACCINE CANDIDATE**," (bold and capital letters in original)
reporting that it had entered into an agreement with Emergent BioSolutions Inc. ("Emergent") to
"develop and manufacture Vaxart's experimental oral vaccine candidate for coronavirus disease
(COVID-19)."  The press release continued with language emphasizing that the contract would
"help advance" the Company's vaccine to the clinic, and that "Emergent is expected to produce
bulk cGMO vaccine", "immediately", and to meet Vaxart's "potential need for future scalability
and large-scale capacity for commercial quantities":

> I'm pleased that we are joining forces with an experienced manufacturer such as
> Emergent to help advance our oral COVID-19 vaccine to the clinic,' said Wouter
> Latour, MD, chief executive officer of Vaxart. 'We believe an oral vaccine
> administered using a room temperature-stable tablet may offer enormous logistical
> advantages in the roll-out of a large vaccination campaign, and Emergent is a great
> partner to help in this endeavor.'  Under the terms of the agreement, development
> services will begin immediately, and upon Vaxart's election, Emergent is expected to
> produce bulk cGMP vaccine allowing Vaxart to initiate a Phase 1 clinical study early

in the second half of 2020. Emergent will provide development services out of its Gaithersburg, MD location and manufacture drug substance at its Bayview facility in Baltimore, MD, designated a Center for Innovation in Advanced Development and Manufacturing (CIADM) by the U.S. Department of Health and Human Services.

'Emergent is pleased to deploy our nimble CDMO expertise to support fellow innovators, like Vaxart, and advance an experimental COVID-19 vaccine candidate,' said Syed T. Husain, senior vice president and CDMO business unit head at Emergent BioSolutions. 'We look forward to applying our broad molecule-to-market services, including our ability to work with a multitude of delivery systems, execute under expedited timelines, and meet Vaxart's potential need for future scalability and large-scale capacity for commercial quantities.'

55.     On March 31, 2020, Defendants caused the Company to issue a press release entitled: "**Vaxart Provides Update on its Oral COVID-19 Vaccine Program**."  And that "it had produced five COVID-19 vaccine candidates for testing in its preclinical models."

56.     On April 14, 2020, the Company filed a Form 8-K with the SEC reporting that the Board had named Defendant Cezar Andrei Floroiu, a pharmaceutical and biotech hand, as the Company's newest and director.  What went unsaid were Floroiu's extensive connections to Armistice and its two principals, Boyd and Maher.  A "personal friend" of Armistice founder and Managing Member Steven Boyd, Floroiu first met Boyd when they both worked for the consulting firm McKinsey.  Later, in 2013, Floroiu worked at Armistice as a senior analyst.  Accordingly, even if Floroiu was independent from a regulatory standpoint, he was not independent in reality, but indebted to Armistice for his new role.

57.     Now with Floroiu on the Board, Armistice controlled five out of the current seven directors, with only Latour and Finney pre-existing Armistice's control.

58.     On April 21, 2020, the Company issued a press release entitled: *Vaxart Announces Positive Pre-Clinical Data for its Oral COVID-19 Vaccine Program*, in which Defendants declared that the Company "obtained positive pre-clinical results for its COVID-19 vaccine candidates, with several of the vaccine candidates generating immune responses in all tested animals after a single dose."  The press release proclaimed the genius of the Company's proprietary platform and the advantages a room temperature-stored, orally-administered COVID-19 vaccine would provide.

59.     On April 28, 2020, the Company issued a press release entitled: "Vaxart Announces Corporate Update for First Quarter 2020" with a subheading "Preparations for the Manufacturing

of GMP Vaccine at Emergent BioSolutions Ongoing." Defendant Latour was quoted as saying, "This has been a busy quarter at Vaxart, as we have focused on developing a vaccine candidate for COVID-19 . . . .  We believe our oral tablet vaccine could be an important tool to help protect the global population from COVID-19."  The press release also highlighted:

- On April 21, 2020, Vaxart announced that its lead vaccine candidates generated anti-SARS CoV-2 antibodies in all tested animals after the first dose. The Company expects to announce additional four-week data within days and the selection of lead development candidate shortly thereafter.

- Vaxart is continuing with its manufacturing collaboration with Emergent and provided Vaxart elects to proceed, is on schedule to produce bulk cGMP vaccine in time for initiation of a Phase 1 clinical study during the second half of 2020.

**D.**     **Armistice Sells a Majority Its Holdings in the Company**

60.     On April 29, 2020, news began to leak that the Trump administration was organizing a Manhattan Project-style effort to drastically cut the time needed to develop a coronavirus vaccine, with a goal of making enough doses for most Americans by year's end.  Called "Operation Warp Speed," the program was "to pull together private pharmaceutical companies, government agencies and the military to try to cut the development time for a vaccine by as much as eight months, according to two people familiar with the matter.  As part of the arrangement, taxpayers will shoulder much of the financial risk that vaccine candidates may fail, instead of drug companies. . . ."

61.     Armistice took immediate advantage of the prospects of government support and funding, selling 873,634 shares on April 29, 2020 – its second sale of Vaxart stock and about 10% of volume – again driving down the stock to close at $3.00, an 8% loss.

62.     On April 30, 2020, the Company issued a press release entitled: "Vaxart Announces Additional Positive Pre-Clinical Data for its Oral COVID-19 Vaccine Program." The press release stated:

Vaxart, Inc., a clinical-stage biotechnology company developing oral recombinant vaccines that are administered by tablet rather than by injection, today announced that it has obtained positive pre-clinical results for its COVID-19 vaccine candidates, with several of the vaccine candidates generating immune responses in all tested animals after a single dose.

'These pre-clinical results confirm that all constructs are immunogenic as measured by IgG antibodies in serum, and we observed a robust boosting effect after the second dose.' said Sean Tucker, Ph.D., chief scientific officer of Vaxart. 'This latest data set will help to select the lead candidate for manufacturing, and we remain on track to start a first phase 1 study in the second half of this year.'

In January 2020, Vaxart initiated a program to develop a COVID-19 vaccine based on its VAASTTM oral vaccines platform. The Company is currently evaluating multiple vaccine candidates in its preclinical models. In this second round of preclinical testing, all animals received two doses of the Vaxart vaccines, two weeks apart. Antibody responses in all vaccinated groups were statistically significant compared to the untreated controls. Vaxart plans to select one or more vaccine candidates for cGMP manufacturing and clinical testing based on the magnitude and the breadth of the immune response.

63.    Between April 29th with the first press reports of Operation Warp Speed, and June 3, 2020, the Company would issue four more press releases, while Armistice dumped 18.2 million of its 25 million shares.  The chart below shows sales by Armistice, with the red dates having not sales — along with significant news or Defendants' press releases.

| Monday | Tuesday | Wednesday | Thursday | Friday |
|---|---|---|---|---|
| | | **4/29**<br><br>873,634<br>Bloomberg Article Leaking OWS | **4/30**<br><br>4,434,296 | **5/1**<br><br>1,000,000 |
| **5/4**<br><br>957,469 | **5/5**<br><br>692,531<br>WSJ Article Confirms OWS | **5/6**<br><br>50,000 | **5/7**<br><br>100,000 | **5/8**<br><br>100,000 |
| **5/11**<br><br>1,300,000 | **5/12**<br><br>1,581,076<br>Vaxart 2 Q Results and Update | **5/13**<br><br>525,616 | **5/14**<br><br>834,669 | **5/15**<br><br>458,639<br>White House Confirms OWS |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| 5/18 | 5/19 | 5/20 | 5/21 | 5/22 |
|---|---|---|---|---|
| 650,000 | | 1,150,000 *Vaxart PR Announcing Choice of Vaccine Candidate* | 400,000 | 200,000 |
| **5/25** | **5/26** | **5/27** | **5/28** | **5/29** |
| *Memorial Day* | | | 200,000 | |
| **6/1** | **6/2** | **6/3** | **6/4** | **6/5** |
| 200,000 | 800,000 | 400,000 *Bloomberg Article* | | |
| **6/8** | **6/9** | **6/10** | **6/11** | **6/12** |
| *Vaxart Annual Meeting* | | | | |
| **6/15** | **6/16** | **6/17** | **6/18** | **6/19** |
| *Vaxart PR Armistice Has "Great Confidence"* | | *Vaxart Present as Raymond James says IND to be filed June* | *Vaxart publishes presentation "Bulk Vaccine in Progress"* | |
| **6/22** | **6/23** | **6/24** | **6/25** | **6/26** |
| | *Vaxart PR to Present at HC Wainwright Thursday* | *Vaxart PR "Set to Join" Russell 3000 (in two days)* | *Vaxart PR Obtains Ability to Manufacture a Billion or more* | 18,226,667 *Vaxart PR **Selected for OWS*** |
| **6/29** | | | | |
| 9,385,386 | Armistice Retains only 145,000 shares | | | |

64.     On May 5, 2020, *The Wall Street Journal* reported that the White House was stepping up efforts to assist companies to quickly develop a vaccine for the virus through the newly announced Operation Warp Speed:

> Health and Human Services Secretary Alex Azar said the president has set a goal of manufacturing 100 million doses of coronavirus vaccine by the fall

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

19

and 300 million by January. The lofty goal is part of the administration's "Operation Warp Speed," which seeks to speed up the development, production and distribution of a vaccine, which often take years to bring to market, according to experts.

65.   On May 12, 2020, Science Magazine published an article entitled: "Unveiling 'Warp Speed,' the White House's America-first push for a coronavirus vaccine", reporting "[t]he project, vaguely described to date but likely to be formally announced by the White House in the coming days, will pick a diverse set of vaccine candidates and pour essentially limitless resources into unprecedented comparative studies in animals, fast-tracked human trials, and manufacturing. . . . [I]t hopes to have 300 million doses by January 2021 of a proven product, reserved for Americans."

66.   On May 12, 2020, the Company issued a press release reporting first quarter results and providing a "Corporate Update" reiterating previous announcements.

67.   On May 15, 2020, the White House formally introduced Operation Warp Speed to the public reporting that through the secretive OWS the U.S. government had already identified 14 of the most promising candidates and was narrowing down the list to which it will provide "unprecedented" support.  In the President's remarks he stated:

Today I want to update you on the next stage of this momentous medical initiative. It's called Operation Warp Speed. . . .

Its objective is to finish developing and then to manufacture and distribute a proven coronavirus vaccine as fast as possible. . . .

The great national project will bring together the best of American industry and innovation, the full resources of the United States government, and the excellence and precision of the United States military. . . .

In preparation for this initiative, experts throughout the government have been collaborating to evaluate roughly 100 vaccine candidates from all over the world. They have identified 14 that they believe are the most promising, and they're working to narrow that list still further. So we started off with over 100, we're down to 14, and we have some really interesting choices to be made. . . .

Through Operation Warp Speed, the federal government is providing unprecedented support and resources to safely expedite the trials, moving on at record, record, record speed. . . .

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

20

> Typically, pharmaceutical companies wait to manufacture a vaccine — a vaccine until it has received all of the regulatory approvals necessary, and this can delay vaccines' availability to the public as much as a year and even more than that. However, our task is so urgent that, under Operation Warp Speed, the federal government will invest in manufacturing all of the top vaccine candidates before they're approved. So we're knowing exactly what we're doing before they're approved. That means they better come up with a good vaccine because we're ready to deliver it.[2]

68.     HHS also issued a press release entitled: "Trump Administration Announces Framework and Leadership for 'Operation Warp Speed'" which reaffirmed that OWS had narrowed the candidates it would support down to 14 and planned to narrow it down further to eight. In relevant part the press release stated:

> On Friday, the Trump Administration announced the appointment of Moncef Slaoui as chief advisor and General Gustave F. Perna as chief operating officer of Operation Warp Speed (OWS), the administration's national program to accelerate the development, manufacturing, and distribution of COVID-19 vaccines, therapeutics, and diagnostics (medical countermeasures) . . . .

> Among its other objectives, Operation Warp Speed aims to have substantial quantities of a safe and effective vaccine available for Americans by January 2021. . . .

> **Elements of Operation Warp Speed**

> Operation Warp Speed is a public-private partnership to facilitate, at an unprecedented pace, the development, manufacturing, and distribution of COVID-19 countermeasures, between components of HHS, including CDC, FDA, NIH, and. . . .

> - **Financial resources**: Congress has directed almost $10 billion to this effort through supplemental funding, including the CARES Act, and Congress has appropriated other flexible funding. Over $6.5 billion has been designated by Congress for countermeasure development through BARDA, along with $3 billion for NIH research. . . .

> *Development*

> - Operation Warp Speed will select the most promising countermeasure candidates and provide coordinated government support to support their development. . . .

> - For example, this process has proceeded for vaccines in the following manner:

---

[2]   Remarks by President Trump on Vaccine Development (May 15, 2020), https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-vaccine-development/.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

21

○ Fourteen promising candidates have been chosen from the 100+ vaccine candidates currently in development — some of them already in clinical trials with U.S. government support.

○ ***The 14 vaccine candidates are being winnowed down to about eight candidates, which will go through further testing in early stage small clinical trials.*** (Bold and Italics added).

69. The news that OWS had identified 14 COVID-19 candidates as possibilities and that it would select eight most promising and provide coordinated government support for their development and testing in early-stage small clinical trials and that large-scale randomized trials would proceed in three to five of them, was widely reported in the financial and regular press.

70. On May 15, 2020, Armistice sold 458,639 shares of Vaxart common stock, grossing approximately $1.3 million.

71. On May 20, 2020, the Company issued a press release entitled: "Vaxart Announces Selection of its Oral COVID-19 Vaccine Lead Candidate." Again, following yet another stock increase, Armistice sold a further 1.15 million shares of Company common stock, grossing approximately $3.7 million.

72. On May 21, 2020, *The Wall Street Journal* reported that the U.S. Government agreed to fund its first vaccine candidate as part of OWS:

> ***U.S. to Invest $1.2 Billion to Secure Potential Coronavirus Vaccine From AstraZeneca, Oxford University Government to bankroll human trial and ramp-up of manufacturing capacity, hoping to get doses in October***
>
> ***The U.S. government has agreed to hand AstraZeneca AZN -0.87% PLC up to $1.2 billion to secure the supply of a potential coronavirus vaccine that could be ready as early as October.***
>
> Under the deal, the government will bankroll a 30,000-person vaccine trial in the U.S. starting in the summer, plus the ramp-up of manufacturing capacity to make at least 300 million doses. The first doses will be ready in the fall should the vaccine prove effective, it said.
>
> Alex Azar, the Health and Human Services secretary, called the deal a "major milestone" in the administration's effort – code-named "Operation Warp Speed" – to make a safe, effective vaccine widely available to Americans by 2021. [Emphasis added].

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

73.     On May 27, 2020, a competitor of the Company in vaccine development issued a press release stating that its affiliate, ImmunityBio was selected for "Operation Warp Speed."  The press release stated:

> NantKwest, Inc. (Nasdaq: NK), a clinical-stage, natural killer cell-based therapeutics company, and ImmunityBio, a privately-held immunotherapy company, today announced ImmunityBio has been selected to participate in Operation Warp Speed, a new national program aiming to provide substantial quantities of safe, effective vaccine for Americans by January 2021. Efforts will focus on the development, testing, and large-scale manufacturing of ImmunityBio's COVID-19 human adenovirus vaccine (hAd5) candidate . . . .
>
> To support these coordinated efforts from vaccine to therapeutics, the two companies have signed a binding term sheet to jointly develop, manufacture, and market therapeutics and vaccines for COVID-19. The binding agreement outlines how development costs will be shared, how profits will be apportioned for any successfully marketed products, and the structure of shared governance of the joint work.
>
> "ImmunityBio is honored to have been selected as one of the 14 companies for Operation Warp Speed and is committed to moving our vaccine candidate through the process to prevent people from contracting this deadly virus," said Patrick Soon-Shiong, M.D., Chairman and CEO of ImmunityBio and NantKwest (Bold and italics added)

74.     Between January 1, 2020 and the news of Operation Warp Speed on April 27th, Armistice sold none of its 25,200,000 shares in Vaxart, nor converted any of its warrants into common stock. But with the hype and speculation surrounding OWS and the possibility of substantial government support, Armistice began to systematically sell all of its stock in a clear show of a complete lack of faith in the Company's prospects.

75.     From April 28 through the first three days of June 2020, Armistice sold an astonishing 72% of its holdings in the Company, or 18,200,000 shares, reducing its common stock holdings down to 7,000,000 shares at an average price of $2.93 per share, and earning gross sales of $53 million — a staggering amount of money, considering the Company had a market capitalization of under $8 million when Armistice bought its first warrants less than one year earlier and the Company traded for mere pennies.  But then Armistice stopped selling.

**DEFENDANTS' SCHEME TO MANIPULATE THE COMPANY'S STOCK PRICE**

76.     By June 1, 2020, Armistice had decided to exit the Company and accordingly had no faith in its prospects or for the stock price to meaningfully rise.[3]

77.     The rate of Armistice's sales through May meant that Armistice would exit its holdings in common stock within days.  However, to completely exit, and recognize the full potential of its profits, Armistice still had 7,000,000 shares of common stock, 16,666,667 warrants to purchase the Company common stock at $0.30 per share and 4,090,909 warrants to purchase the Company common stock at $1.10 per share.

78.     By June 1, 2020, Armistice demanded that it be allowed to exercise its warrants and sell off all of its Company stock.  Upon information and belief, on that date, the Board had a telephone conference without the two Armistice Directors, Boyd and Maher, to discuss a request by Armistice to amend the warrants. No minutes were taken of this June 1, 2020 call and a list or "pros and cons" of whether to approve the warrant amendments requested by Boyd and Maher appears to have been discussed.  But the amendments could only be for one purpose — for Armistice to fully dispose of its shares by the end of June.

79.     While negotiating the warrant amendments, another critical development occurred that presented Defendants with further ammunition to manipulate the Company's stock price ahead of Armistice's plan to exercise all of its warrants by the end of June and sell off all of its stock holdings in the Company.

80.     On June 3, 2020, *Bloomberg* and *The New York Times* identified the names of five companies selected for funding by the recently announced U.S. federal government-sponsored program to speed the development of multiple COVID-19 vaccines, known as Operation Warp Speed.  *The New York Times* article stated:

---

[3]     Armistice sold two-thirds of its common stock holdings on sales exceeding $53 million, which would represent over 25% of the Company's market capitalization of $203 million that day – on June 3, 2020, Armistice abruptly halted its sales entirely.  As of that day, Armistice retained, in addition to its 7,000,000 shares of common stock, the entirety of both sets of warrants, 16,666,667 warrants to purchase Company common stock at $0.30 per share and 4,090,909 warrants to purchase Company common stock at $1.10 per share.

> The Trump administration has selected five companies as the most likely candidates to produce a vaccine for the coronavirus, senior officials said, a critical step in the White House's effort to deliver on its promise of being able to start widespread inoculation of Americans by the end of the year.
>
> By winnowing the field in a matter of weeks from a pool of around a dozen companies, the federal government is betting that it can identify the most promising vaccine projects at an early stage, speed along the process of determining which will work and ensure that the winner or winners can be quickly manufactured in huge quantities and distributed across the country.
>
> The announcement of the decision will be made at the White House in the next few weeks, government officials said.  [Emphasis added].

81.    The companies were Moderna, AstraZeneca, Johnson & Johnson, Merck & Co., and Pfizer.  When OWS was initially announced on May 15, 2020, HHS's press release noted that there were "about eight candidates, which will go through further testing in early-stage small clinical trials."   Now, with five of those candidates identified, speculation mounted as to the identities of the unknown two or three.   As noted above, "We're not confirming anyone's involvement in the initial group [of vaccines] unless a company is bound by fiduciary requirements to report contractual agreements," said Michael Caputo, an HHS spokesperson for Warp Speed, as reported by Science Magazine on June 1st.

82.    The Company was not one of the unidentified two or three vaccine candidates selected for OWS, a fact Defendants knew on June 3, 2020.

83.    Defendants also would have known that OWS had imposed a strict set of selection criteria that the Company did not qualify for but would have known from required information it would have had to submit.  Though the selection criteria were a secret to the public at the time, under no circumstances could Defendants have been under the mistaken belief that the Company's inchoate oral vaccine was selected.  As Moncef Slaoui and Matthew Hepburn, OWS's head and development lead, co-wrote in the New England Journal of Medicine ("NJEM") on August 26, 2020:

> OWS selected vaccine candidates on the basis of four criteria. We required candidates to have robust preclinical data or early-stage clinical trial data supporting their potential for clinical safety and efficacy. Candidates had to have the potential, with our acceleration support, to enter large phase 3 field efficacy trials this summer or fall (July to November 2020) and, assuming

continued active transmission of the virus, to deliver efficacy outcomes by the end of 2020 or the first half of 2021. Candidates had to be based on vaccine-platform technologies permitting fast and effective manufacturing, and their developers had to demonstrate the industrial process scalability, yields, and consistency necessary to reliably produce more than 100 million doses by mid-2021. Finally, candidates had to use one of four vaccine-platform technologies that we believe are the most likely to yield a safe and effective vaccine against Covid-19: the mRNA platform, the replication-defective live-vector platform, the recombinant-subunit-adjuvanted protein platform, or the attenuated replicating live-vector platform.  [Emphasis added].

84.    Alex M. Azar II ("Azar"), HHS Secretary, and Slaoui wrote on September 2, 2020, in *USA Today*, that OWS "aim[ed] to select eight candidates for support, two from each platform," in order to "buil[d] a portfolio that will maximize our chances at success."

85.    As noted in the NEJM article, OWS sought vaccine candidates with "the potential . . . to enter large phase 3 field efficacy trials this summer or fall (July to November 2020)."  At the time, the Company's COVID-19 vaccine candidate was nowhere near that stage and the Company had repeatedly informed the public: "Manufacturing of our COVID-19 vaccine is on track to start a first phase 1 study in the second half of this year, possibly as early as the summer."

86.    As the NEJM article noted: OWS targeted "four vaccine-platform technologies" and as the USA Today article noted, OWS aimed to select "two from each platform."  Vaxart's COVID-19 candidate utilized a "replication defective" platform, the same platform utilized by two of the publicly named companies, Johnson & Johnson and AstraZeneca.  Therefore, even if Vaxart was prepared to promptly launch a "large phase 3 field efficacy trial[]" for its COVID-19 vaccine candidate – which it was absolutely not – OWS still would not have selected the Company anyway.  For this additional reason, it would have been impossible for Vaxart to believe that their COVID-19 candidate was selected.

87.    On Monday, June 8, 2020, Defendants solidified their agreement and plan to allow Armistice to exit the Company through selling of 28 million shares by the end of June, and in return approve the stock grants and other rewards to Defendants.

88.    Over the next few days, Defendants lost little time in orchestrating the removal of Latour (one of the two pre-Armistice directors remaining) as CEO.  Instead, Latour was replaced

by Board member and former Armistice employee, Defendant Floroiu, a "personal friend" of Armistice Founder, Managing Member and current Board colleague, Defendant Boyd, who also served as his boss when Floroiu worked for the hedge fund.

89.     On June 13, 2020, by unanimous written consent, the Board resolved to: (i) allow Latour to step down from the CEO position; (ii) treat the resignation as a termination without cause; (iii) provide him with severance benefits under the Company's Severance Benefit Plan upon the purported termination without cause; and (iv) allow his outstanding stock options to continue to vest during his new, materially less demanding position as non-executive Chairman of the Board.

90.     On the same date, the Board approved a Letter Agreement with Floroiu providing for a base salary of up to $400,000, a target bonus opportunity of up to 50% of base salary, 845,280 time-based stock options, 900,000 performance-based stock options, a $100,000 success bonus, and a three-month severance under the Company's Severance Benefit Plan.

91.     Following Armistice's conclusion of their large stock sale on June 3, 2020, throughout the next three weeks, the Company's common stock floundered in the low- to mid-$2.00 range, pressed down under the weight of the hedge fund's sale of an astounding 18.2 million shares.

92.     On June 15, 2020, Defendants caused the Company to issue a press release entitled: *Vaxart, Inc. Appoints New CEO to Accelerate Advancement of COVID-19 and Other Programs*. The press release stated:

> Vaxart, Inc. ('Vaxart' or the 'Company'), a clinical-stage biotechnology company developing oral recombinant vaccines that are administered by tablet rather than by injection, announced that effective today it has appointed Andrei Floroiu as Chief Executive Officer. Mr. Floroiu is a highly experienced biopharma executive with a proven track record of value creation, with substantial financial, strategic and operational experience in the vaccine and biopharmaceutical industry. He has served as a member of Vaxart's Board of Directors since April 2020 and will continue on the board while serving as Chief Executive Officer. Wouter Latour, MD will remain as Chairman of the Board and a director of the Company.
>
> 'I am delighted to welcome Andrei to Vaxart and want to express my deepest confidence in him as we transition Vaxart's leadership,' said Dr. Latour. 'It has been an honor to lead this incredibly talented team and advance the clinical programs of the Company for the last eight years, and the Board of Directors and I

are looking forward to working with Andrei and the management team to drive the Company to the next stage of growth.'

Mr. Floroiu was most recently with Agenus, Inc., an immuno-oncology and vaccine pioneer, where he held executive positions and was responsible for structuring strategic partnerships and other transactions, including the origination and execution of a $115 million royalty transaction based on GSK's Shingrix vaccine. Prior to Agenus, Mr. Floroiu was a Managing Director at Exigo Capital providing strategic advice to C-suite executives and Boards. Mr. Floroiu also brings prior biopharma investment and advisory experience with The Invus Group, a leading healthcare investment firm, and McKinsey & Co, a leading management consultancy. Mr. Floroiu holds an MBA from the Wharton School, an MSc from the University of Maryland, and an Engineering degree from the Politechnica University of Bucharest.

'This is an exciting time for Vaxart, with tremendous prospects for growth and value creation in the new world ushered in by the coronavirus crisis,' said Andrei Floroiu. ***'Wouter and the Vaxart team rought the company to the remarkable position of playing a potentially crucial role in the reopening of America, and the world, by rapidly advancing the development of what could be the most effective and most convenient COVID-19 vaccine.*** I am convinced that our work on COVID-19 will further validate the unique potential of Vaxart's oral vaccine technology against other viral threats and as a rapid response pandemic platform. Our strong balance sheet, with almost $30 million in cash as of March 31st, enables us to intensify our efforts, while also building upon the interest in the Company's disruptive vaccine platform.'

***'With Andrei's appointment, we are pleased to have a seasoned executive with experience in vaccines and business development to build out the Company and set it on a path of sustainable growth,'*** said Steven Boyd, a member of Vaxart's Board of Directors. ***'As Vaxart's largest institutional investor, and having personally known Andrei since we both worked at McKinsey, I have great confidence in his ability to generate substantial shareholder value by unlocking the Company's tremendous potential*** . . . .' [Emphasis added].

93.   On June 18, 2020, the Company filed a Form 8-K with the SEC reporting that it intended to present an updated corporate presentation at the Raymond James Human Health Innovation Conference that day.  A copy was also posted on the Company's website.

94.   The website,  also reported that Good Manufacturing Practice ("GMP") for "Bulk Vaccine in Progress" and that the Company would submit its Investigative New Drug application ("IND") to the FDA within 12 days (June month end):

## Oral COVID-19 Vaccine – Phase 1 Ready

CDMO Partners
- Tech Transfers Complete
- GMP Bulk Vaccine in Progress





## Highlights

- Disruptive Oral vaccine platform
  - Validated approach: BARDA-funded flu challenge study
  - Could emerge as the ideal solution for COVID-19
    - Potentially best in class efficacy: mucosal & systemic immunity
    - Appeal of oral administration, low cost across supply chain, environmentally friendly
  - Advantages apply to other airborne & mucosal viruses - e.g., flu, norovirus, etc.)
- Covid-19 program advancing rapidly
  - Phase 1 to start in Summer 2020
  - Manufacturing in place
- Norovirus program phase 2 ready
- Rapid response pandemic platform: plug-n-play, ready for future pandemics
- Strong balance sheet: ~$30M cash on hand per March 31

🌐 VAXART                                                                                   | 14

95.     Defendants had no real expectation that human clinical trials would start in June and were not ready to file their IND, which was a necessary requirement before starting clinical trials. The IND was not submitted to the FDA until August 10, 2020.

96.     On June 23, 2020, Defendants caused the Company to issue a press release entitled *Vaxart, Inc. to Present at the H.C. Wainwright Virtual Fireside Chat Series*, reporting that Defendant Floroiu would participate in a live broadcast chat at the H.C. Wainwright Fireside Chat Series on Thursday, June 25, at 10:25 am ET.

97.     This "live chat" was timed to occur with another planned announcement and just one day before Armistice's planned sale of stock.

98.     On June 24, 2020, the Company announced that effective June 29, 2020, it would join the Russell 3000, a stock market index benchmarked to the 3,000 largest publicly traded U.S. companies. The press release stated:

> 'I am extremely pleased with our progress to date in our ongoing effort to disrupt the vaccine industry by developing a transformative oral vaccine that is not only more convenient to administer but has the potential to offer better protection than injectables against airborne viruses such as SARS-CoV-2, which causes COVID-19. Inclusion in the Russell 3000 Index has the potential to increase

the liquidity of our stock and expose us to a wide range of institutions, investors, and index funds that reference them, facilitating the Company's growth, and drive the Company on its pathway to success,' said Andrei Floroiu President and Chief Executive Officer of Vaxart, Inc.

99.     Vaxart's new-found manufacturing ability, along with that day's H.C. Wainwright statements, including Defendant Floroiu's statement that "there may be other news, partnering and so on" that they would announce shortly, primed investors for the next day's planned "selected for" OWS announcement they had been withholding until the right time.

100.    On June 25, 2020, the Company participated in H.C. Wainwright Virtual Fireside Chat Series.  Defendant Floroiu and Tucker, the Company's Founder and Chief Scientific Officer, participated and presented to the audience. During the conference Tucker stated, referring to a slide previously shown at the June 18 Raymond James Conference: "Again, we're working really fast, as fast as we've ever been able to do in for and we're about really [sic] submit our IND [Investigational New Drug Application] and really open up the regulatory path to start dosing people soon in the summer of this — this summer that is."  The same corporate presentation used a week earlier showing the IND submission *in June* was shown to investors.

101.    Also at the conference, Tucker made reference to the press release (below) in response to a question by the host as to "what are the technical challenges you think is specific to Vaxart developing its coronavirus vaccine?"  Tucker stated that "there's a press release that just came out today that, we've just signed an ***agreement with a major player*** that has great (inaudible) capabilities.  So now that solves one of, what I would say, our biggest technical bottleneck in terms of manufacturing."

102.    Defendant Floroiu then reaffirmed that the "IND . . . should happen pretty soon and then following the start of human clinical trials which as Sean noticed should happen this summer."

103.    Finally, as a preview to building the excitement for the next days' OWS "selection for" OWS press release, Defendant Floroiu stated: "Besides that, there may be some other news on other fronts, partnering and so on that will release whenever they happen."

104.    On June 26, 2020, Defendants caused the Company to issue a press release en titled in bold letters *Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp*

*Speed*.   In the following paragraph, the Company's new CEO, Defendant Floroiu stated: "We are very pleased to be one of the few companies selected by Operation Warp Speed, and that ours is the only oral vaccine being evaluated."



**Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed**

June 26, 2020

**OWS to Test First Oral COVID-19 Vaccine in Non-Human Primates**

SOUTH SAN FRANCISCO, Calif., June 26, 2020 (GLOBE NEWSWIRE) -- Vaxart, Inc., a clinical-stage biotechnology company developing oral vaccines that are administered by tablet rather than by injection, today announced that its oral COVID-19 vaccine has been selected to participate in a non-human primate (NHP) challenge study, organized and funded by Operation Warp Speed, a new national program aiming to provide substantial quantities of safe, effective vaccine for Americans by January 2021.

The study is designed to demonstrate the efficacy of Vaxart's oral COVID-19 vaccine candidate.

"We are very pleased to be one of the few companies selected by Operation Warp Speed, and that ours is the only oral vaccine being evaluated. SARS-CoV-2, the coronavirus that causes COVID-19, is primarily transmitted by viral particles that enter through the mucosa - nose, mouth or eyes - strongly suggesting that mucosal immunity could serve as the first line of defense," said Andrei Floroiu, Chief Executive Officer of Vaxart Inc. "In addition, our vaccine is a room temperature-stable tablet, an enormous logistical advantage in large vaccination campaigns."

**About Vaxart**
Vaxart is a clinical-stage biotechnology company focused on developing oral tablet vaccines designed to generate mucosal and systemic immune responses that protect against a wide range of infectious diseases and has the potential to provide sterilizing immunity for diseases such as COVID-19. Vaxart believes that a room temperature stable tablet vaccine is easier to distribute, store and administer than injectable vaccines and may provide significantly faster response to a pandemic than injectable vaccines, enabling a greater portion of the population to be protected. Vaxart's development programs include oral tablet vaccines that are designed to protect against coronavirus, norovirus, seasonal influenza and respiratory syncytial virus (RSV), as well as a therapeutic vaccine for human papillomavirus (HPV). For more information, please visit www.vaxart.com.

105.   The press release creates the impression that the Company's vaccine had been selected by OWS as one of the eight recipients under consideration for significant support or consideration from OWS to produce billions of vaccines by January 2021.  In truth, the Company was not among the companies selected to receive significant support or consideration from OWS to produce hundreds of millions of vaccine doses.  As later clarified by Michael R. Caputo, the HHS assistant secretary for public affairs: "The U.S. Department of Health and Human Services has entered into funding agreements with certain vaccine manufacturers, and we are negotiating with others. Neither is the case with Vaxart […]. Vaxart's vaccine candidate was selected to participate in preliminary U.S. government studies to determine potential areas for possible Operation Warp Speed partnership and support. At this time, those studies are ongoing, and no determinations have been made."

106.   As planned, that same day Armistice timed its sales with the announcement, converting the entirety of its $0.30 Warrants to common stock – 16,666,667 shares – and then

selling those shares, along with an additional 1,560,000 of its existing common stock holdings at prices between $7.97 and $12.89 per share for an average price of $10.38 per share.  This sale of over 18.2 million shares grossed Armistice $189 million and dragged down the Company's common stock price from its intra-day high.

107.    The following trading day on June 29, 2020, Armistice converted the entirety of its $1.10 Warrants into common stock – 4,090,909 shares – and sold those shares, along with 5,294,477 shares of existing common stock holdings at prices between $6.58 and $9.90 per share for an average sales price of $8.29 per share. This sale of almost 9.4 million shares grossed Armistice a further $77.8 million.

108.    Even with the 19.99% ownership limitation amended warrant threshold, Armistice could not exercise all of its warrants at once and sell the common stock — it still took two days.  As admitted by Armistice:

> Following Vaxart's pre-market public announcement regarding the Primate Study on June 26, 2020, Vaxart's stock price increased, rising from $6.26 per share to close at $8.04. Armistice only began to exercise the Warrants after the Primate Study information was made public. To facilitate the exercises, Armistice emailed exercise notices to Vaxart, identifying the Warrant series and number of shares it was exercising each time. Armistice could not exercise all 20,757,576 Warrants at once due to the 19.99% exercise restriction (20,757,576 Warrants); (May 12, 2020 Form 10-Q) (as of May 11, 2020, Vaxart had 74,184,322 shares). Instead, it necessarily had to do so in blocks, successively selling down its holdings and then buying back below the 19.99% threshold. Armistice paid Vaxart the exercise price for the shares it received following each exercise. In total, Armistice paid Vaxart $9.5 million for the 20,757,576 warrant shares it received between June 26 and June 29.

109.    Armistice almost completely liquidated all of its common stock ownership in the Company, retaining just 0.2% of the Company's outstanding common stock. These contemporaneous stock sales of over 27.6 million shares grossed Armistice approximately $267 million. When combined with its earlier sales, Armistice grossed approximately $320 million.

110.    Defendants' aoverstated the Company's involvement with OWS. In truth, despite Defendant Floroiu's declaration, the Company was *not* "one of the few companies selected by Operation Warp Speed." The Company deliberately blurred the line between the two programs,

1   willfully misleading investors and convincing the market that the Company's COVID-19 vaccine

2   candidate was one of the two or three unknown vaccine candidates selected for federal funding.

3   Indeed, the Company was **not** selected for **any** federal funding.  The Company was **merely**

4   granted **permission** to test its COVID-19 vaccine candidate on non-human primates.

5        111.    Defendants knew that the headline and Floroiu's quote was at best an over-

6   statement that would be misunderstood by a material number of investors who would then jump at

7   the chance to buy the Company shares.  In September they toned down the language to more

8   accurately reflect that this was nothing more than a "preclinical program . . . being conducted in

9   collaboration with the Biomedical Advanced Research and Development Authority (BARDA)

10  and other entities working with Operation Warp Speed."

11       112.    On July 10, 2020, the Company raised gross proceeds of approximately $90 million

12  through its At-the-Market (ATM) facility with participation based on "interest received" from RA

13  Capital Management and Invus.[4]  The Company sold approximately 11.2 million shares at $7.98

14  per share, the market price at the time of sale. SVB Leerink served as lead sales agent and B. Riley

15  FBR served as co-sales agent for the ATM facility. This sale was not announced until Monday, July

16  13, 2020, in a press release and SEC filing.

17       113.    On July 22, 2020, *The Motley Fool* analyst Alex Carchidi wrote an article entitled

18  *Everything You Need to Know About Operation Warp Speed's Coronavirus Vaccine Accelerator*:

19
20      With the coronavirus pandemic gripping the world, governments everywhere are
    desperate to speed up the discovery of a vaccine. In the U.S., since May, this dire
21  need has been addressed by a vaccine accelerator project called Operation Warp
    Speed (OWS), which subsidizes public and private companies to the tune of billions
22  of dollars, to incentivize vaccine development at the fastest possible pace.

23      Given the high stakes and the formidable impact of the program's grants, savvy
    healthcare investors looking to create a portfolio of coronavirus stocks need to learn
24  about Operation Warp Speed and its implications for the global vaccine race.

25

26  _____

27  [4]    Defendant Floroiu had a close relationship with Invus where he was formerly a portfolio
    manager at Invus, a principal at the Invus Public Equities Advisors LLC.  From 2004 to 2008, he
28  served as a principal for The Invus Group, a private equity investment firm.

Ambitious timetables and meaty grants make OWS a potential equalizer for participants

According to the Department of Health and Human Services (HHS), which sponsors the program, Operation Warp Speed aims to "deliver 300 million doses of a safe, effective vaccine for COVID-19 by January 2021, as part of a broader strategy to accelerate the development, manufacturing, and distribution of COVID-19 vaccines, therapeutics, and diagnostics." HHS runs the accelerator with the help of the Biomedical Advanced Research and Development Authority (BARDA), a lesser-known government organization responsible for developing vaccines or therapies for novel epidemics and bioweapon attacks.

***So far, it's thought that OWS has funded at least nine independent coronavirus vaccine efforts and a smattering of related projects, with awards split almost evenly between large pharmas and clinical-stage biotech companies.*** Most investors know big pharma participants like Pfizer (NYSE: PFE), AstraZeneca (NYSE: AZN), and Johnson & Johnson (NYSE: JNJ), whereas biotechs like Moderna (NASDAQ: MRNA), Novavax (NASDAQ: NVAX), and Vaxart (NASDAQ: VXRT) are newcomers to the limelight created by the program.

Most of the biotech companies funded by OWS have no products with regulatory approval for sale, but that hasn't stopped them from getting large infusions of cash. Moderna received $500 million from the program, and Novavax accepted a stunning $1.6 billion award. These OWS grants have been favorable for investors, with stocks skyrocketing on news of each company's selection for the program.

***However, it's impossible to confirm exactly which projects are receiving funding, or how much funding is being disbursed in total, thanks to ongoing and opaque negotiations about commercialization between authorities and participants in the operation.*** Similarly, it's unclear which criteria OWS uses to pick vaccine candidates to accelerate, but positive preliminary results are likely a decisive factor. One thing is certain: The accelerator is only intended to aid American companies in producing vaccine doses for domestic use, and competitors from China are explicitly excluded.  [Emphasis added].

## THE TRUTH EMERGES

114.    On July 25, 2020, *The New York Times* published an article entitled *Corporate Insiders Pocket $1 Billion in Rush for Coronavirus Vaccine*, which highlighted the sums Armistice earned from its contemporaneous stock sales. *The New York Times* article stated:

**Corporate Insiders Pocket $1 Billion in Rush for Coronavirus Vaccine**

Well-timed stock bets have generated big profits for senior executives and board members at companies developing vaccines and treatments.

On June 26, a small South San Francisco company called Vaxart made a surprise announcement: A coronavirus vaccine it was working on had been selected by the U.S. government to be part of Operation Warp Speed, the flagship federal initiative to quickly develop drugs to combat Covid-19.

Vaxart's shares soared. Company insiders, who weeks earlier had received stock options worth a few million dollars, saw the value of those awards increase sixfold. And a hedge fund that partly controlled the company walked away with more than $200 million in instant profits.

The race is on to develop a coronavirus vaccine, and some companies and investors are betting that the winners stand to earn vast profits from selling hundreds of millions – or even billions – of doses to a desperate public.

Across the pharmaceutical and medical industries, senior executives and board members are capitalizing on that dynamic.

They are making millions of dollars after announcing positive developments, including support from the government, in their efforts to fight Covid-19. After such announcements, insiders from at least 11 companies – most of them smaller firms whose fortunes often hinge on the success or failure of a single drug – have sold shares worth well over $1 billion since March, according to figures compiled for The New York Times by Equilar, a data provider.

In some cases, company insiders are profiting from regularly scheduled compensation or automatic stock trades. But in other situations, senior officials appear to be pouncing on opportunities to cash out while their stock prices are sky high. And some companies have awarded stock options to executives shortly before market-moving announcements about their vaccine progress.

The sudden windfalls highlight the powerful financial incentives for company officials to generate positive headlines in the race for coronavirus vaccines and treatments, even if the drugs might never pan out.

***Some companies are attracting government scrutiny for potentially using their associations with Operation Warp Speed as marketing ploys***.

For example, the headline on Vaxart's news release declared: 'Vaxart's Covid-19 Vaccine Selected for the U.S. Government's Operation Warp Speed.' ***But the reality is more complex***.

Vaxart's vaccine candidate was included in a trial on primates that a federal agency was organizing in conjunction with Operation Warp Speed. But Vaxart is not among the companies selected to receive significant financial support from Warp Speed to produce hundreds of millions of vaccine doses.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

35

'The U.S. Department of Health and Human Services has entered into funding agreements with certain vaccine manufacturers, and we are negotiating with others. Neither is the case with Vaxart,' said Michael R. Caputo, the department's assistant secretary for public affairs. 'Vaxart's vaccine candidate was selected to participate in preliminary U.S. government studies to determine potential areas for possible Operation Warp Speed partnership and support. At this time, those studies are ongoing, and no determinations have been made.'

**Some officials at the Department of Health and Human Services have grown concerned about whether companies including Vaxart are trying to inflate their stock prices by exaggerating their roles in Warp Speed, a senior Trump administration official said. The department has relayed those concerns to the Securities and Exchange Commission, said the official, who spoke on the condition of anonymity.**

\* \* \*

**Vaxart, though, is where the most money was made the fastest.**

At the start of the year, its shares were around 35 cents. Then in late January, Vaxart began working on an orally administered coronavirus vaccine, and its shares started rising.

Vaxart's largest shareholder was a New York hedge fund, Armistice Capital, which last year acquired nearly two-thirds of the company's shares. Two Armistice executives, including the hedge fund's founder, Steven Boyd, joined Vaxart's board of directors. The hedge fund also purchased rights, known as warrants, to buy 21 million more Vaxart shares at some point in the future for as little as 30 cents each.

Vaxart has never brought a vaccine to market. It has just 15 employees. But throughout the spring, Vaxart announced positive preliminary data for its vaccine, along with a partnership with a company that could manufacture it. By late April, with investors sensing the potential for big profits, the company's shares had reached $3.66 — a tenfold increase from January.

On June 8, Vaxart changed the terms of its warrants agreement with Armistice, making it easier for the hedge fund to rapidly acquire the 21 million shares, rather than having to buy and sell in smaller batches.

One week later, Vaxart announced that its chief executive was stepping down, though he would remain chairman. The new C.E.O., Mr. Floroiu, had previously worked with Mr. Boyd, Armistice's founder, at the hedge fund and the consulting firm McKinsey.

On June 25, Vaxart announced that it had signed a letter of intent with another company that might help it mass-produce a coronavirus vaccine. Vaxart's shares nearly doubled that day.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

36

The next day, Vaxart issued its news release saying it had been selected for Operation Warp Speed. Its shares instantly doubled again, at one pointing hitting $14, their highest level in years.

'We are very pleased to be one of the few companies selected by Operation Warp Speed, and that ours is the only oral vaccine being evaluated,' Mr. Floroiu said.

Armistice took advantage of the stock's exponential increase – at that point up more than 3,600 percent since January. On June 26, a Friday, and the next Monday, the hedge fund exercised its warrants to buy nearly 21 million Vaxart shares for either 30 cents or $1.10 a share – purchases it would not have been able to make as quickly had its agreement with Vaxart not been modified weeks earlier.

Armistice then immediately sold the shares at prices from $6.58 to $12.89 a share, according to securities filings. The hedge fund's profits were immense: more than $197 million.

'It looks like the warrants may have been reconfigured at a time when they knew good news was coming,' said Robert Daines, a professor at Stanford Law School who is an expert on corporate governance. 'That's a valuable change, made right as the company's stock price was about to rise.'

At the same time, the hedge fund also unloaded some of the Vaxart shares it had previously bought, notching tens of millions of dollars in additional profits.

By the end of that Monday, June 29, Armistice had sold almost all of its Vaxart shares.

Mr. Boyd and Armistice declined to comment.

Mr. Floroiu said the change to the Armistice agreement "was in the best interests of Vaxart and its stockholders" and helped it raise money to work on the Covid-19 vaccine.

He and other Vaxart board members also were positioned for big personal profits. When he became chief executive in mid-June, Mr. Floroiu received stock options that were worth about $4.3 million. A month later, those options were worth more than $28 million.

Normally when companies issue stock options to executives, the options can't be exercised for months or years. Because of the unusual terms and the run-up in Vaxart's stock price, most of Mr. Floroiu's can be cashed in now.

Vaxart's board members also received large grants of stock options, giving them the right to buy shares in the company at prices well below where the stock is now trading. The higher the shares fly, the bigger the profits.

'Vaxart is disrupting the vaccine world,' Mr. Floroiu boasted during a virtual investor conference on Thursday. He added that his impression was that 'it's OK to make a profit from Covid vaccines, as long as you're not profiteering.' [Emphasis added].

115.   The article pointed out that the Company was never "selected for" OWS – and, further, denied that Vaxart was currently even under consideration:

Vaxart's vaccine candidate was included in a trial on primates that a federal agency was organizing in **conjunction** with Operation Warp Speed. But ***Vaxart is not among the companies selected to receive significant financial support from Warp Speed to produce hundreds of millions of vaccine doses.***

'The U.S. Department of Health and Human Services has entered into funding agreements with certain vaccine manufacturers, and we are negotiating with others. ***Neither is the case with Vaxart***,' said Michael R. Caputo, the department's assistant secretary for public affairs. 'Vaxart's vaccine candidate was selected to participate in ***preliminary*** U.S. government studies to determine ***potential*** areas for ***possible*** Operation Warp Speed partnership and support. At this time, those studies are ongoing, and no determinations have been made.' [Emphasis added].

116.   The NHP study ***participation*** and "selection for" OWS are two distinct areas, the article explained.   According to the HHS Spokesperson quoted in the article, the former is a "***preliminary***" study that may assist the federal government "to determine ***potential*** areas for ***possible*** Operation Warp Speed partnership and support." [Emphasis added].  These are contingent words, spoken in the future tense, by the HHS Spokesperson, showing what ***may*** happen at a later date, not the past tense language from Vaxart's June 26, 2020 press release – "We are very pleased to be one of the few companies selected by Operation Warp Speed." – hammering home the Vaxart headline of already belonged to the group of companies "selected for" OWS.

117.   The article stated that HHS officials took note of the misleading press release and upon learning about Armistice's contemporaneous stock sales, alerted the SEC:

Some officials at the Department of Health and Human Services have grown concerned about whether companies including Vaxart are trying to inflate their stock prices by exaggerating their roles in Warp Speed, a senior Trump administration official said. The department has relayed those concerns to the Securities and Exchange Commission, said the official, who spoke on the condition of anonymity.

118.   That same day, HHS Office of the Assistant Secretary of Public affairs issued a message on the official account HHS Public Affairs twitter site @SpotHHS:

> The US Department of Health and Human Resources has entered into funding agreements with certain vaccine manufacturers and we are negotiating with others. **Neither is the case with Vaxart**. [Emphasis added].

119.   HHS even sent out a second tweet further clarifying the *de-minimis* nature of Vaxart's connection with OWS:

> Vaxart's vaccine candidate was selected to participate in preliminary US government studies to ***determine potential areas for possible*** Operation Warp Speed partnership and support. At this time, those studies are ongoing and ***no determinations have been made***. [Emphasis added].

120.   HHS' concerns were justified and on October 14, 2020, the Company released a Form 8-K that admitted that their June 26, 2020 press release and the contemporaneous trades by Armistice have drawn scrutiny from federal investigators at the SEC and Department of Justice. According to the Form 8- K, in July 2020, the Company received a Grand Jury Subpoena from the U.S. Attorney's Office for the Northern District of California, calling for documents "which broadly pertain to the Company's participation in, and disclosure of, an Operation Warp Speed ('OWS')-funded nonhuman primate study, and option grants, warrant transactions, and other corporate and financing matters."   Additionally, the same Form 8-K admitted that in August 2020 the SEC requested "a variety of documents that broadly pertain to same subject matters of the documents provided to the U.S. Attorney's Office, and related matters." One month later, in its 3Q 2020 10-Q, the Company also revealed that as of October 2020, the U.S. Attorney for the Eastern District of New York and the Fraud Section of the Department of Justice ("DOJ") were also investigation and that shortly thereafter the Company received a DOJ grand jury subpoena seeking substantially the same information as the subpoena from the Northern District of California.

121.   The following trading day after *The New York Times* article, on July 27, 2020, the Company's common stock fell to $11.16, a 9% drop from the prior trading day's closing price.

122.    Over the next three weeks, as the market digested the news that the Company overstated its participation with the federal government in developing a COVID-19 vaccine, its common stock slid, falling a further 17.5% through August, 19, 2020.

123.    After the market closed that day, *Business Insider* released an interview with OWS head Moncef Slaoui that closed the door on the Company and its claim that it had been selected by OWS in an article entitled: "***The leader of Operation Warp Speed says some biotechs 'misled their shareholders" and 'frustrated the hell' out of him by playing up connections to the secretive government program***."   The article states:

> The head of Operation Warp Speed, the US government's secretive coronavirus vaccine initiative, has had it with companies that put out press releases claiming they're involved in the program.
>
> ***
>
> 'There's been a number of cases where companies have, frankly, made press releases that have frustrated the hell out of me because they ***misled***, I think, ***their shareholders*** and their share price went up the roof just by saying the words Operation Warp Speed in the title of the press release,' Slaoui told *Business Insider*. [Emphasis added].

124.    While the Company was not named on the record by Slaoui, the article identified the Company as fitting the description, and in particular the Company's press release entitled, *Vaxart's COVID-19 Vaccine Selected for the U.S. Government's Operation Warp Speed*, noting the Company was not selected for Operation Warp Speed.   The head of Operation Warp Speed went on to explain why OWS had been secretive of its selection process and why it could now talk about it.

> Warp Speed was seeking to back eight vaccines that range across four different types of technology, Slaoui said.
>
> If the program was publicly upfront about what it was looking for, Slaoui said 'you'll have 25 companies with their shares going up the roof, 25 with their shares going down, every board being sued, shareholders, et cetera, et cetera. Because people will speculate what is it we are going after.'
>
> Now, with the major funding deals in place and announced, Slaoui said Warp Speed is undergoing a 'natural progression' where it can talk more openly about its work.

125.     As a result, the Company's stock fell a further 4.3% the following day, August, 20, 2020, to close at $8.81.

### DUTIES OF DEFENDANTS

126.     By reason of their positions as officers, directors, and/or fiduciaries of Vaxart and because of their ability to control the business and corporate affairs of Vaxart, Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Vaxart in a fair, just, honest, and equitable manner.  Defendants were and are required to act in furtherance of the best interests of Vaxart and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest or benefit.

127.     Each director and officer of the Company owes to Vaxart and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, financial condition, and present and future business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

128.     Defendants, because of their positions of control and authority as directors and/or officers of Vaxart, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with Vaxart, each of the Defendants had access to adverse non-public information about the financial condition, operations, sales and marketing practices, and improper representations of Vaxart.

129.     To discharge their duties, the officers and directors of Vaxart were required to exercise reasonable and prudent supervision over the management, policies, practices, and

controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Vaxart were required to, among other things:

a)      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

b)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c)      properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d)      remain informed as to how Vaxart conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e)      ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

130.    Each Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Vaxart, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware or should have been aware posed a risk of serious injury to the Company.

131.     Each director and officer of the Company owed to Vaxart the fiduciary duty to exercise due care and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing. In addition, as officers and/or directors of a publicly held company, Defendants had a duty not to advance their own personal, financial, or economic interests over, and at the expense of, the Company's public shareholders, or to allow other Vaxart directors, officers, and/or employees to do so. Each director and officer of the Company also owed Vaxart and its shareholder-owners the duty to maintain the Company's confidential information and prevent others from misappropriating and/or trading while in possession of the Company's proprietary, confidential information.

132.     Defendants breached their duties of loyalty and good faith by causing the Company to misrepresent the information as detailed *infra*. Defendants subjected the Company to the costs of defending and the potential liability from a class action lawsuit for violations of the federal securities laws. As a result, Vaxart has expended, and will continue to expend, significant sums of money.

133.     Defendants' actions have irreparably damaged Vaxart's corporate image and goodwill.

## THE COURT SUSTAINS THE CLAIMS IN THE SECURITIES CLASS ACTION

134.     In the Securities Class Action, Judge Vince Chhabria issued an order (D.E. 182) (the "Order") on the defendants' motion to dismiss holding:

> Vaxart, its current officers, and its former officers. The complaint makes a strong case that Vaxart and its officers intended to mislead the investing public. On the question whether the statements were materially misleading, it's true that the statements were crafted carefully, mixing intentionally misleading statements with more accurate ones. A meticulous investor—scrutinizing every word and fluent in the opaque vocabulary that pervades corporate press releases—may have seen through the misleading aspects of Vaxart's statements. On these unusual facts, however, the fact that the Vaxart defendants can describe their statements as "literally true" based on a close and isolated reading does not require dismissal of the complaint. Considering the context, circumstances, and the manner in which the company communicated its progress to the market, the complaint does enough to identify specific statements that would have misled a reasonable investor. Order at p. 19.

135.     The Order (D.E. 182) further held:

The complaint adequately alleges that the Vaxart defendants knowingly misled the investing public about the company's progress in developing a vaccine for the coronavirus. The plaintiffs identify two statements in particular that plausibly count as material misrepresentations under Rule 10b-5(b): Vaxart's announcement that it had partnered with Attwill, enabling the company to "manufacture a billion or more doses per year," and Vaxart's press release the next day announcing that it had been "[s]elected for the U.S. Government's Operation Warp Speed."  Order at p. 7.

Both the Attwill and Warp Speed press releases—when considered together and in the context of Vaxart's prior statements—created the materially misleading impression that Vaxart stood at the precipice of pioneering a successful coronavirus vaccine. In the period leading up to the statements, investors knew five of the government's funding recipients but could only speculate as to which two or three other companies might benefit from an influx of government funds. Vaxart, for its part, claimed swift progress on its vaccine development, positioned its vaccine candidate alongside the likes of Moderna, Pfizer, and J&J, and highlighted that manufacturing was "in place." The company also lauded its vaccine as having the "potential to offer better protection than injectables." Taken together, "the information then available to the market" gave the impression that Vaxart could well be on the cusp of achieving something momentous.  *In re Convergent*, 948 F.2d at 512.  Order at p. 8.

Against that backdrop, Vaxart's announcement that it had partnered with Attwill was materially misleading. Recall Vaxart's assertion that the agreement enabled production of one billion vaccine doses per year. Remember too that the company did not stop at a press release— its Chief Scientific Officer lauded the partnership as "an agreement with a major player" that would solve key manufacturing hiccups. But the complaint plausibly alleges that Attwill lacked the regulatory capacity, personnel, and wherewithal to produce even one dose, never mind one billion. Through the eyes of a reasonable (and, by this point, eager) investor, it is easy to see how Vaxart's announcement about Attwill would have changed the game. The announcement seemed to turn potentials into realities, "significantly alter[ing] the 'total mix' of information" in investors' hands. *TSC Industries*, 426 U.S. at 449.  Order at p. 9.

Much the same can be said of the Operation Warp Speed press release announced the next day. As with the Attwill release, Vaxart capitalized on hype it had generated around its vaccine candidate. And it exploited a gap in the public's knowledge: investors were still eager to learn the identity of the remaining Warp Speed recipients. With that context in mind, Vaxart's bold headline that it had been "[s]elected" for Warp Speed would have misled a reasonable investor into thinking that the company would be flush with funds, enabling it to quickly bring a vaccine to market. But as later reports confirmed, the government had not in fact chosen Vaxart to receive significant government funding to create and manufacture a coronavirus vaccine. Order at p. 9

In short, the complaint adequately alleges that both the Attwill and Warp Speed press releases would have misled a reasonable investor. It "specif[ies] each statement" and

offers clear "reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1). Materiality is, after all, a "fact-specific inquiry." *Basic Inc. v. Levinson*, 485 U.S. 224, 240 (1988). It would be inappropriate to dismiss the claims against Vaxart at this stage where the plaintiffs have identified specific statements that plausibly would have misled the investing public.  Order at pp. 9, 10.

As for the Warp Speed announcement, Vaxart similarly argues that its press release was literally true, and therefore cannot count as materially misleading. But as already discussed, even statements "literally true on their face" can mislead a reasonable investor "when considered in context." *Miller*, 519 F.3d at 886. Context is particularly potent in a case like this. As the complaint plausibly alleges, the trickle of information about Warp Speed prompted investors to perch at the edge of their seats, eager to find the next rocket stock in the healthcare space. Those circumstances proved ripe for companies hoping to capitalize on hype and speculation. And the complaint plausibly alleges that Vaxart designed its press release to take advantage of just this environment. The headline announced that it had been "selected" for "Warp Speed," while the body—in smaller font set below—disclosed the crucial reality that Vaxart had been chosen only to participate in a primate study and not to receive a vast influx of federal funds. The release also came immediately on the heels of the company's announcement about being "enabled" to manufacture one billion doses. Just as words matter, so too does "manner of presentation." *McMahan*, 900 F.2d at 579.  Order at p. 11.

***

It is plausible—indeed almost certain—that the Vaxart defendants either knew all this or "were reckless as to the truth or falsity" of their claim about Attwill's capabilities. *Gebhart v. S.E.C.*, 595 F.3d 1034, 1041 (9th Cir. 2010). It is difficult to imagine that a fledgling firm like Vaxart—a firm that has never taken a successful vaccine to market—would fail to do basic diligence on its key partner in developing a crucial product. Vaxart touted the partnership on its website and lauded the agreement as a key breakthrough. It strains credulity to think the company would have acted without ensuring that Attwill could actually produce the one billion doses it claimed. Looked at another way, Attwill played such a central role in Vaxart's vaccine plan that it would be "absurd to suggest that management was without knowledge" of its deficiencies. *South Ferry*, 542 F.3d at 784. In view of the context and circumstances, the complaint raises a "strong inference" that the Vaxart defendants knew their statements about Attwill were false or misleading. 15 U.S.C. § 78u-4(b)(2)(A).  Order at p. 13.

Even more so for the Operation Warp Speed press release. The complaint alleges that the Vaxart defendants knew that the company had not been selected to receive federal funding through Warp Speed. It asserts that the defendants knew the company had been selected for the primate study long before the press release, giving them ample time to craft a statement that would mislead the market. And it notes that the company later "toned down the language to more accurately reflect" that it had been selected only for a "preclinical program." The headline itself creates a strong inference that the defendants were acting with intent to mislead and to elicit an unduly favorable reaction

by the market. All these facts taken together and in context create an even stronger inference that the Vaxart defendants deliberately crafted a press release designed to make it seem as if the company had achieved something significant—a trough of federal funding through Warp Speed—when in fact it had accomplished nothing of the sort.  Order at pp. 13, 14.

### DEMAND FUTILITY ALLEGATIONS
### FOR THE BOARD OF VAXART

136.    Plaintiffs will adequately and fairly represent the interests of Vaxart and its shareholders in enforcing and prosecuting its rights.

137.    Plaintiffs bring this action derivatively in the right and for the benefit of Vaxart to redress injuries suffered and to be suffered by Vaxart because of the breaches of fiduciary duty by Defendants.

138.    Because of the facts set forth herein, Plaintiffs have not made a demand on the Board of Vaxart to institute this action against Defendants.  Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

139.    The Vaxart Board is currently comprised of Floroiu, Davis, Finney and Yedid, and non-parties Julie M. Cherrington, Karen J. Wilson, and David Wheadon.  Thus, Plaintiffs are required to show that a majority of Defendants, *i.e.*, *four* (4), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

140.    Defendants face a substantial likelihood of liability in this action because they caused Vaxart to issue false and misleading statements concerning the information described herein. Because of their advisory, executive, managerial, and directorial positions with Vaxart, Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

141.    Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation, proximately causing millions of dollars of losses for Vaxart shareholders.

142.     Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this Complaint, Plaintiffs have not made (and is excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

143.     Any suit by the Board to remedy these wrongs would likely expose the Company to further violations of the securities laws that would result in civil actions being filed; thus, the Board members are hopelessly conflicted in making any supposedly independent determination about whether to sue themselves.

144.     Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

145.     Defendants authorized and/or permitted the Company to make false statements that disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

## DEFENDANTS ARE NOT INDEPENDENT

**Defendant Floroiu**

146.     Defendant Floroiu is the CEO of the Company.  Defendant Floroiu is also a director of the Company.

147.     Defendant Floroiu is not disinterested or independent, and therefore, is incapable of considering demand because Floroiu (as CEO) is an employee of the Company who derived substantially all of his income from his employment with Vaxart, making him not independent. As such, Floroiu cannot independently consider any demand to sue himself for breaching his

1   fiduciary duties to the Company, because that would expose him to liability and threaten his

2   livelihood.

3       148.    This lack of independence and financial benefits received by Defendant Floroiu

4   renders him incapable of impartially considering a demand to commence and vigorously

5   prosecute this action.

6       149.    Defendant Floroiu is also a defendant in the securities class actions entitled *In re*

7   *Vaxart, Inc. Sec. Litig.*, Master Case No.: 3:20-cv-05949-VC (N.D. Cal.) (the "Securities Class

8   Action")

9   **Defendants Maher, Floroiu, Yedid, Davis, and Finney**

10      150.    Defendants Maher, Floroiu, Yedid, Davis, and Finney are defendants in the

11  Securities Class Action.

12      151.    The complaint in the Securities Class Action asserts claims against Defendants

13  Maher, Floroiu, Yedid, Davis, and Finney as the Company's decisionmakers, which included

14  the content and dissemination of the various statements giving rise to a claim under Rule 10b-5.

15  The court in the Securities Class Action sustained those claims.  For those reasons, demand is

16  futile as to Defendants Maher, Floroiu, Yedid, Davis, and Finney as they are exposed to liability

17  in the Securities Class Action and they would never bring claims against themselves when they

18  are facing liability in the parallel Securities Class Action.

19                          **FIRST CAUSE OF ACTION**

20                  **(Against Defendants For Breach of Fiduciary Duty)**

21      152.    Plaintiffs incorporate by reference and re-allege each allegation contained above,

22  as though fully set forth herein.

23      153.    Defendants owed and owe Vaxart fiduciary obligations.  By reason of their

24  fiduciary relationships, Defendants owed and owe Vaxart the highest obligation of good faith,

25  fair dealing, loyalty and due care.

26      154.    Defendants, and each of them, violated and breached their fiduciary duties of

27  care, loyalty, reasonable inquiry, oversight, good faith and supervision.

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

155.    Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the business prospects of the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

156.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, Vaxart has sustained significant and actual damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

157.    Plaintiffs, on behalf of Vaxart, have no adequate remedy at law.

## SECOND CAUSE OF ACTION

### (Against Defendants for Unjust Enrichment)

158.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

159.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of Vaxart in the form of salaries, bonuses, and other forms of compensation.

160.    Plaintiffs, as shareholders and representatives of Vaxart, seek restitution from Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## THIRD CAUSE OF ACTION

### (Against Defendants for Abuse of Control)

161.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

162.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence the Company, for which they are legally responsible.

163.    As a direct and proximate result of Defendants' abuse of control, the Company has sustained significant damages.  As a direct and proximate result of Defendants' breaches of

their fiduciary obligations of candor, good faith, and loyalty, the Company has sustained and continues to sustain significant damages.

164.    As a result of the misconduct alleged herein, Defendants are liable to the Company.  Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## FOURTH CAUSE OF ACTION

### (Against Defendants for Waste of Corporate Assets)

165.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

166.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, Defendants have caused the Company to waste valuable corporate assets by failing to disclose (i) the Company had a material weakness in its internal control over financial reporting; (ii) the Company's disclosure controls and procedures were not effective; and (iii) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

167.    As a result of the waste of corporate assets, Defendants are each liable to the Company.

168.    Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### (Against Defendants Floroiu, Davis, Finney, Yedid, Maher, Boyd, and Latour for Contribution for Violations of Sections 10(b) and 21D of the Exchange Act)

169.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

170.    Defendants Floroiu, Davis, Finney, Yedid, Maher, Boyd and Latour are named as defendants in related Securities Class Action, which has been sustained.  The conduct of these defendants, as described herein, has exposed the Company to significant liability under various federal and state securities laws by their disloyal acts.

171.   The Company is named as a defendant in related Securities Class Action that alleges and asserts claims arising under § 10(b) of the Exchange Act.  The Company is alleged to be liable to private persons, entities and/or classes by virtue of many of the same facts alleged herein.  If the Company is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the Defendants Floroiu, Davis, Finney, Yedid, Maher, Boyd, and Latour, as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts.  The Company is entitled to contribution and indemnification from these Defendants in connection with all claims that have been, are, or may be asserted against the Company by virtue of their wrongdoing.

172.   As officers, directors and otherwise, these Defendants had the power or ability to, and did, control or influence, either directly or indirectly, the Company's general affairs, including the content of its public statements, and had the power or ability to directly or indirectly control or influence the specific corporate statements and conduct that violated § 10(b) of the Exchange Act and SEC Rule 10b-5.

173.   These Defendants are liable under § 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Exchange Act.

174.   These Defendants have damaged the Company and are liable to the Company for contribution.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiffs pray for relief and judgment as follows:

A.   Against Defendants in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties, unjust enrichment, abuse of control, waste of corporate assets and violations of Sections 10(b) and 21D of the Exchange Act;

B.   Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorney's fees, accountants' and experts' fees, costs, and expenses; and

C.   Granting such other and further relief as the Court deems just and proper.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1

**JURY TRIAL DEMANDED**

2

    Plaintiffs hereby demand a trial by jury.

3

DATED: May 24, 2022

4

                         **MAGNANIMO DEAN LAW, APC**

5

                         By: */s/ Lauren A. Dean*

6

                             LAUREN A. DEAN (SBN 174722)
                         5850 Canoga Avenue, Suite 400

7

                         Woodland Hills, CA 91367
                         Telephone: (818) 305-3450

8

                         Facsimile: (818) 305-3451

9

                         Email: Lauren@MagDeanLaw.com

10

                         Thomas J. McKenna
                         Gregory M. Egleston

11

                         **GAINEY McKENNA & EGLESTON**

12

                         501 Fifth Avenue, 19th Floor
                         New York, NY 10017

13

                         Telephone: (212) 983-1300
                         Facsimile: (212) 983-0383

14

                         Email: tjmckenna@gme-law.com
                         Email: gegleston@gme-law.com

15

16

                         ***Attorneys for Plaintiffs***

17

18

19

20

21

22

23

24

25

26

27

28

## **VERIFICATION**

I, Peter Noges, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Vaxart, Inc. ("Vaxart"), and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations to which I have personal knowledge. I believe those allegations to be true. As to those allegations to which I do not have personal knowledge, I rely on my counsel, as well as the investigation conducted by myself and my counsel, and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Vaxart common stock during the time period in which the wrongful conduct alleged and complained of in the Complaint occurred, and that I will continue to hold shares of Vaxart common stock through the conclusion of this litigation.

Dated: May _____19_____, 2022

_____
PETER NOGES

**VERIFICATION**

    I, Victoria Morales, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Vaxart, Inc. ("Vaxart"), and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations to which I have personal knowledge. I believe those allegations to be true. As to those allegations to which I do not have personal knowledge, I rely on my counsel, as well as the investigation conducted by myself and my counsel, and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Vaxart common stock during the time period in which the wrongful conduct alleged and complained of in the Complaint occurred, and that I will continue to hold shares of Vaxart common stock through the conclusion of this litigation.

Dated: May 20 , 2022

VICTORIA MORALES

VERIFICATION

1